**IN THE
UNITED STATES COURT OF APPEAL
FOR THE THIRD CIRCUIT**

_____

Docket No. 10-4188

_____

UNITED STATES OF AMERICA,

Appellee,

v.

DORIAN SWAN,

Appellant.

_____

On Appeal From:    The United States District Court for the District of the Virgin
Islands, The Honorable Judge Curtis Gomez, Chief Judge, Presiding

_____

**BRIEF OF APPELLANT DORIAN SWAN**
_____

JOHN R. HOWES, ESQ.
JOHN R. HOWES, P.A.
633 S. Andrews Avenue, Suite 500
Fort Lauderdale, FL 33301
Tel: 954.763.6003
Florida Bar No. 219193
Attorney for Appellant

NO. 10-4188

In The

United States Court of Appeals

For the Third Circuit

UNITED STATES OF AMERICA,

Appellee,

v.

DORIAN SWAN,

Appellant.

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

A.    <u>Corporate Disclosure Statement</u>

This appeal does not involve a non-governmental corporate defendant.

There are no parent companies, subsidiaries, or affiliate companies that have issued

shares to the public.

B.    <u>Certificate of Interested Persons</u>

Chief Judge Curtis Gomez, Trial Judge, District Court Judge

Delia L. Smith Esq., Lead Attorney, U.S. Attorney's Office, St. Thomas, V.I.

Kim Lindquist Esq., U.S. Attorney's Office St. Thomas, V.I.

Nolan Paige Esq., U.S. Attorney's Office St. Thomas, V.I., St. Thomas, V.I.

Gregory D. Hodges, Michael C. Quinn; Trial Counsel for Dorian Swan

John R. Howes, Esq., Appellate Counsel for Dorian Swan

# **TABLE OF CONTENTS**

**Page**

TABLE OF CITATIONS                                               v - vi

STATEMENT OF JURISDICTION OF THE DISTRICT COURT                 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW                        2

STATEMENT OF RELATED CASES AND PROCEEDINGS                      3

STATEMENT OF THE CASE                                           4

STATEMENT OF THE FACTS                                          5

STANDARDS OF REVIEW                                             8

ARGUMENT                                                        11

**I.     INSUFFICIENT EVIDENCE WAS ADDUCED AT TRIAL
         TO CONVICT MR. SWAN OF THE CHARGED
         CONSPIRACY.**                                          11

**II.    ADMISSION OF EVIDENCE AGAINST MR. SWAN RAN
         AFOUL OF FED. R. EVID. §404(b).**                      18

**III.   THE INTERESTS OF JUSTICE REQUIRE THAT A NEW
         TRIAL BE ORDERED, BECAUSE THE GOVERNMENT
         PREJUDICIALLY MISCHARACTERIZED
         EVIDENCE DURING CLOSING.**                             20

CONCLUSION                                                      21

CERTIFICATE OF COMPLIANCE-FRAP RULE 32                          22

CERTIFICATE OF COMPLIANCE WITH E-FILING RULES                   23

iii

CERTIFICATE OF BAR MEMBERSHIP                                    24

CERTIFICATE OF SERVICE                                          25

# TABLE OF CITATIONS

**CASES** **Page**

*Becker v. ARCO Chemical Co.*, 207 F.3d 176, 189 (3rd Cir. 2000 ........................ 20

*Berger v. United States*, 295 U.S. 78 (1935) ………………………………………..21

*Blumenthal v. United States,* 332 U.S. 539, 558, 68 S.Ct. 248, 92
    L.Ed. 154 (1947)    ………………………………………………………………18

*Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) ..18

*United States v. Bevans*, 728 F.Supp. 340, 343 (E.D.Pa.1990).  ........................... 9

*United States v. Bobb*, 471 F.3d 491 (3d Cir.2006)…. …………………………8, 9

*United States v. Cartwright*, 359 F.3d 281 (3rd Cir. 2004). .................................. 11

*United States v. Charles*, 949 F.Supp. 365, 368, 35 V.I. 306 (D.Vi.1996)   .. ........ 9

*United States v. Coleman*, 811 F.2d 804, 808 (3d Cir.1987).  .............................. 10

*United States v. Cooper*, 567 F.2d 252, (3rd Cir.1977)………………….............10

*United States v. Cooper*, 121 F.3d 130 (3rd Cir. 1997)........................................ 11

*United States v. Hopkins*, 518 F.2d 152 (3rd Cir. 1975). ..................................... 16

*United States v. Iafelice*, 978 F.3d 92 (3rd Cir. 1992)........................................... 12

*United States v. Idowu*, 157 F.3d 265 (3rd Cir. 1998).............................. 10, 14, 15

*United States v. Kapp*, 781 F.2d 1008 (3rd Cir. 1986) .. ....................................... 11

*United States v. Kelly*, 892 F.2d 255, 259 (3rd Cir. 1989) ………………………..18

*United States v. Kemp,* 500 F.3d 257 (3rd Cir. 2007)……………………………...18

*United States v. Mastrangelo*, 172 F.3d 288, 293 (3d Cir.1999)............................ 10

*United States v. Salmon*, 944 F.2d 1106 (3rd. Cir. 1991)........................... 11, 18, 19

*United States v. Scanzello*, 832 F.2d 18, 20 (3d Cir.1987).................................... 12

*United States v. Wexler*, 838 F.2d 88 (3rd Cir. 1988). ......................................... 10

*United States v. Terselich*, 885 F.2d 1094, 1098 (3d Cir.1989). ............................ 10

*United States v. Thomas*, 114 F.3d 403 (3rd Cir. 1997)………………. 10, 12,13,14

*United States v. Zavala*, 190 Fed. Appx. 131 (3rd Cir. 2006)………..10, 12, 13,14

## Statutes

18, U.S.C. §3231................................................................................................... 1

18 U.S.C. §3742.................................................................................................... 1

21 U.S.C. §841(a)(1). ....................................................................................... 1, 2

21U.S.C. §841(b)(1)(A)(ii)(II). ......................................................................... 1, 2

28 U.S.C. §1613(a). ............................................................................................. 1

28 U.S.C. §1291.................................................................................................... 1

Federal Rule of Evidence §404(b). ...................................................................... 2

## STATEMENT OF JURISDICTION OF THE DISTRICT COURT

The district court had jurisdiction of this case pursuant to Title 18, U.S.C. §3231 because the Defendant was charged with offenses against the laws of the United States. The Court of Appeals has jurisdiction over this appeal pursuant to 28 U.S.C. §1291 and 18 U.S.C. §3742, which gives the Courts of Appeals jurisdiction over all final decisions and sentences of the district courts of the United States.

## SUBJECT MATTER AND APPELLATE JURISDICTION

This is an appeal of a criminal judgment imposed in the United States District Court for the Virgin Islands for violations of 21 U.S.C. §841(a)(1); 21U.S.C. §841(b)(1)(A)(ii)(II), Conspiracy to Possess with Intent to Distribute a Controlled Substance. The District Court of the Virgin Islands Division of St. Thomas and St. John was the court below, and had subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1613(a). The Third Circuit Court of Appeals has jurisdiction to consider this appeal pursuant to 28 U.S.C. §1291 and Federal Rule of Appellate Procedure 4(b). A timely notice of appeal as to the first case was filed on October 27, 2010.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

I.      Whether the District Court incorrectly determined that the Government's evidence was sufficient to establish Mr. Dorian Swan was guilty of conspiracy to distribute cocaine and possession of cocaine with intent to distribute, in violation of 21 U.S.C. §841(a)(1); 21U.S.C. §841(b)(1)(A)(ii)(II).    [A. 2023, 2054]

II.     Whether it was Prejudicial Error to Admit said evidence in violation of FRE 404(b) and 403. [A. 1017-1019]

III.    Whether The Interests of Justice require a new trial based on improper mischaracterization of evidence by the Government in closing remarks. [A. 2292, 2295]

## STATEMENT OF RELATED CASES & PROCEEDINGS

A search for associated cases revealed the following individuals have matters pending before this Court:   Vernon Fagan, Court of Appeals Docket #: 10-4694; Kerry Woods, Court of Appeals Docket #: 10-4041, and Gelean Mark, Court of Appeals Docket # 10-4224.

## **STATEMENT OF THE CASE**

Dorian Swan, the Appellant in this case [hereinafter "Mr. Swan"] was convicted of Conspiracy to Possess with Intent to Distribute a Controlled Substance in violation of 21 U.S.C. §841(a)(1); 21 U.S.C. §841(b)(1)(A)(ii)(II), Count I of a two count-indictment. [D.E. 1260]. Mr. Swan maintained his plea of not guilty throughout this process. He filed a Motion for Judgment of Acquittal pursuant to Federal Rule of Criminal Procedure 29(c) and properly renewed that motion. [A1985, 2059]. A Rule 33 Motion was also filed and preserved for purposes of this appeal. Both were denied at the time of trial. Mr. Swan was sentenced to serve 210 months in prison and five year supervised release. [D.E. 1260]. He is currently in the custody of the Bureau of Prisons serving that sentence.

## STATEMENT OF THE FACTS

The charged conspiracy concerned drugs which traveled from South America through Tortola, to St. Thomas, V.I., and finally to North Carolina in the United States. At trial, the government called twenty witnesses, four of whom offered testimony in relation to Mr. Swan.   The charged conspiracy centered around an organization led by James Springette.   Springette did not mention Mr. Swan in his testimony.   He admitted that he sold drugs to all the individuals on the government's conspiracy illustration chart. [A172].   Mr. Swan's name was nowhere on that chart, or on the chart prepared by Elton Turnbull, Mr. Springette's first cousin, [A174, 196, 276] who worked directly underneath Mr. Springette. Turnbull testified that on a few occasions, Mr. Swan paged him, which according to Turnbull was a signal to pick up drugs. [A267].   Turnbull never witnessed Mr. Swan in possession of drugs, and never witnessed him pick up or distribute any drugs.

The government asked Mr. Turnbull "[H]ow many times, if you can recall, did you receive drugs from Mr. Mark through Mr. Swan?"   To this Mr. Turnbull replied "On roughly three or four different occasions.   There were - I received cocaine of the amount of ten kilos from Mr. Swan."   [A268].   Additionally, Turnbull provided an in-court identification of Mr. Swan.   *Id.* According to Turnbull this all occurred after 2002.   None of his testimony established other

than a buyer-seller relationship existed between Turnbull's group and Mr. Swan.

Turnbull actively managed and supervised many of Springette's transactions. [A181-82].   According to Turnbull, Swan had another, separate drug route that originated in St. Croix.   He indicated that Mr. Swan tried to recruit him as a buyer, in an attempt to divert business away from Gelean Mark (also known as "Kerwin")[A187, 191], whose route was also the subject of the instant conspiracy, as he was well connected in the airports.   [A259].   Turnbull testified Kerwin was in charge of moving Springette's shipment from St. Thomas to North Carolina. [A260-61].   The route referred to by Turnbull as belonging to Swan was different that alleged in the conspiracy. [A267]. Turnbull stated "We used Swan's route when our route got too hot."   He testified that his personal knowledge of the organization ended in October 2002 with his arrest.

Another witness, Glenson Isaac, previously convicted in a prior related case, was a customer of key conspirator Gelean Mark, and sold narcotics for Turnbull. Glenson Isaac characterized the route as being from St. Thomas in the Virgin Islands to North Carolina. Glenson Isaac testified that Swan had a different route, namely the one from St. Croix to New York.   Glenson Isaac indicated he did not supply drugs to New York.   However, he did testify that in June 2003, he received two kilos of cocaine in New York, and that someone driving a car in which Mr. Swan was a passenger delivered the two kilos. [A438]. He testified that

he had first met Swan in May 2003.   Glenson Isaac did not compensate the parties who delivered the two kilos to him.   Glenson Isaac used women from North Carolina to courier drugs from St. Thomas and to take money back to the island. During a drug run through an airport, Glenson Isaac suffered a seizure and drugs were seized from him.   Glenson Isaac conclusively testified that Swan was not linked to the drugs that were seized from him at the St. Thomas airport. [A609].

Next, Glenson Isaac's brother, Rolston Kevon Isaac ("Kevon Isaac") also testified in relation to Mr. Swan, however testimony regarding Swan's involvement was not based on personal knowledge.   Kevon Isaac conceded that he "wasn't too far away from the [Swan's] apartment". [A1390].   He testified that he witnessed some women delivering 19-22 kilos to Mr. Swan's Baltimore apartment.   Kevon's testimony related to a time before 2001, while Mr. Swan was still living in Baltimore.

Christopher Swaney then testified that sometime after 2004, he purchased twenty kilograms of cocaine from Mr. Swan.   [A941-48].   Swaney also explained that Swan attempted to divert business away from the alleged conspirators, and that his relationship with Mr. Swan was "minimal". [A940, 941-48], that he was not introduced to Mr. Swan until 2004, [A941], after he had already concluded his purchases with Mr. Isaac. [A939].

During closing argument the government commented on other evidence it

had introduced at trial, namely a recorded telephone conversation between Mr. Swan and Kevon Isaac. A motion in limine was filed regarding this recording. [A1073].

During the December 2003 telephone conversation Swan told Isaac "Ah, some day ago I had couple little fowl and thing um, 'Thrush' end up with two of them.   So I had to drive up there and get the cab from he and dem f***, you know what I mean?" [Gov. Ex. (GX) 44].   On closing the government characterized this evidence as proof of the June 2003 transaction described by Glenson Isaac to tie him into the Glenson-Mark conspiracy.   Counsel for Mr. Swan made a contemporaneous objection. [A2295].   The Government conceded that Mr. Isaac's testimony limited Mr. Swan's involvement to May or June 2003. [A2300]. The telephone conversation took place in December 2003.   The transaction the government sought to tie it to take place in May or June of 2003.

In its charge to the jury, the Court instructed that it would be sufficient if the evidence "establishes beyond a reasonable doubt that the offense was committed on dates reasonably near the dates alleged." [A2279].

### STANDARD OF REVIEW

I.    Denial of a Rule 29 motion is reviewed de novo. *United States v. Bobb*, 471 F.3d 491 (3d Cir. 2006).   On review, the evidence is analyzed as a

whole, asking whether "it is strong enough for a rational trier of fact to find guilt beyond a reasonable doubt." In a conspiracy case, slight evidence of the defendant's connection to the conspiracy is not sufficient, and "guilt must remain individual and personal." *United States v. Boria*, 592 F.3d 476 (3rd Cir. 2010). "A judgment of acquittal is appropriate under Rule 29 if, after reviewing the record in a light most favorable to the prosecution, the Court determines that no rational jury could find proof of guilt beyond a reasonable doubt and the verdict is supported by substantial evidence." *Bobb*, 471 F.3d 491, 494 (3d Cir.2006).

II.    "Under the plain error standard, a reviewing court may reverse the district court "only if [it] finds that (1) an error was committed; (2) the error was plain, that is, 'clear' and 'obvious;' and (3) the error 'affected' [the defendant's] substantial rights ... The burden is on the defendant to demonstrate that "plain error'" occurred. *U.S. v. Lin*, 131 Fed.Appx. 884, 886-887 (3rd Cir. 2005).

III.    Under Rule 33, the reviewing Court has greater discretion, and may grant a new trial "in the interest of justice." *United States v. Charles*, 949 F.Supp. 365, 368, 35 V.I. 306 (D.Vi.1996). In assessing such "interest" the court may weigh the evidence and credibility of witnesses. *United States v. Bevans*, 728 F.Supp. 340, 343 (E.D.Pa.1990). If the Court determines that there has been a miscarriage of justice, the court may order a new trial. *Id.*

**ARGUMENT**

I.  **INSUFFICIENT EVIDENCE WAS ADDUCED AT TRIAL TO CONVICT MR. SWAN OF THE CHARGED CONSPIRACY.**

An individual's conspiracy cannot be based solely on his keeping of bad company.  *United States v. Terselich*, 885 F.2d 1094, 1098 (3d Cir.1989)*; United States v. Cooper*, 567 F.2d 252, 55 (3d Cir.1977) (finding evidence insufficient although defendant and co-conspirator shared motel room, travelled across the country, and drugs were found in a truck).   Although a challenge to a conviction based on insufficient evidence has often been termed an uphill battle and as placing a heavy burden upon a defendant, this court has under similar factual and evidentiary circumstances repeatedly overturned convictions based on insufficient evidence. *See United States v. Cooper*, 121 F.3d 130, 133 (3rd Cir. 1997); *United States v. Zavala*, 190 Fed. Appx. 131 (3rd Cir. 2006); *United States v. Mastrangelo*, 172 F.3d 288, 293 (3d Cir.1999); *United States v. Idowu*, 157 F.3d 265 (3rd Cir. 1998); *United States v. Thomas*, 114 F.3d 403 (3rd Cir. 1997); *United States v. Salmon*, 944 F.2d 1106 (3rd. Cir. 1991) (holding evidence was insufficient to sustain conviction for conspiring to possess with intent to distribute cocaine); *United States v. Wexler*, 838 F.2d 88 (3rd Cir. 1988).   In addition, "the Government cannot prove a conspiracy charge merely by piling inference upon inference." *United States v. Coleman*, 811 F.2d 804, 808 (3d Cir.1987).   An inference cannot be "based solely on speculation about a possible prior relationship

between [the appellant] and [a co-conspirator], about how [the appellant] got to the [location of the transaction], and about what [the appellant] was doing prior to being sighted with [a co-conspirator], matters as to which there is no evidence." *United States v. Cartwright*, 359 F.3d 281, 288(3rd Cir.2004).

To meet its burden of proving a conspiracy to possess, the government must show: "(1) a unity of purpose between the alleged conspirators; (2) an intent to achieve a common goal; and (3) an agreement to work together toward that goal." By itself, evidence of a buyer-seller relationship is insufficient to establish conspiracy.   *United States v. Kapp*, 781 F.2d 1008 (3rd Cir. 1986).

In this case, the government failed to establish any of the above requirements.   Considerably, there was no evidence that Mr. Swan was in agreement with the other alleged co-conspirators or with any of the few key witnesses who testified against him in relation to this particular conspiracy.    In the same vein, no evidence offered by the cooperating witnesses linked Mr. Swan so as to establish possession of drugs related to the instant conspiracy.

In a case similar to this one, this Court reversed a defendant's conspiracy conviction. "We have explained that, in order to sustain a conspiracy conviction, the government must put forth 'evidence tending to prove that defendant entered into an agreement and knew that the agreement had the specific unlawful purpose

charged in the indictment." *United States v. Thomas*, 114 F.3d 403 (3rd Cir. 1997)(quoting *United States v. Scanzello*, 832 F.2d 18, 20 (3d Cir.1987)).

In *Thomas*, the Court reversed the Appellant's conviction because no evidence supported the inference of knowledge that drugs were involved. The Court focused its attention on the defendant's probable degree of knowledge under the circumstances, and reasoned that it would be mere speculation to deduce the defendant knew the object of the conspiracy, despite overwhelming circumstantial evidence that "he knew he was somehow involved in an illicit activity".    The same can be said in this case as was said in *Thomas*.

In *United States v. Zavala*, 190 Fed. Appx. 131 (3rd Cir. 2006), the Third Circuit reversed a defendant's conviction based on insufficient evidence that the defendant knew that he was involved in illicit activity.    In that case, the defendant was observed mailing a package with a return address of an individual he did not know.    The package contained 1,300 grams of methamphetamine.

Just as the defendant's mailing a package in *Zavala* was insufficient to establish knowledge, Mr. Swan's happening to be a passenger in a car or sending of pages is equally lacking.    *See e.g. United States v. Iafelice*, 978 F.3d 92 (3rd Cir. 1992)(affirming conviction because inter alia, defendant <u>owned</u> the car) (added emphasis). Similar to this case, the testimony presented at trial did not link the defendant to the conspiracy alleged in the indictment and argued at trial.

Here, it cannot even be said that Mr. Swan ever held the subject drugs, or that he constructively possessed them.

In *Zavala*, the court's decision was rooted in a long line of cases reversing convictions based on insufficient evidence.    This Court reasoned as follows:

> [T]his court has [consistently] overturned convictions for conspiracy in drug possession and distribution because of the absence of any evidence that the defendant had knowledge that drugs were involved.' For example, in *United States v. Wexler*, 838 F.2d 88 (3d Cir.1988), Wexler was observed driving in a manner evidencing that he was acting as a lookout for a truck containing hashish. He was also seen communicating with fellow conspirators during the transport of the drugs. Moreover, the police discovered a CB radio bought with a false name in the car Wexler had been driving. Nevertheless, we found the evidence insufficient to establish "that Wexler knew that a controlled substance was couched behind the doors of the Ryder truck." *Id.* at 91. We concluded that "[i]t [was] more likely than not that [he] suspected, if not actually knew, that some form of contraband was involved in the elaborate secretive arrangements for transport in which he participated." *Id.* at 92. The evidence, however, did "not support a holding that the government met its burden to prove beyond a reasonable doubt that [he] knew this was a conspiracy to transport hashish or even another controlled substance. The evidence is just as consistent, for example, with a conspiracy to transport stolen goods, an entirely different crime." *Id.* at 92; see *United States v. Cooper*, 567 F.2d 252, 254 (3d Cir.1977) ("[T]here [was] no evidence that [appellant] knew what was in the padlocked rear compartment.... One may not be convicted of conspiracy solely for keeping bad company."); see also *United States v. Terselich*, 885 F.2d 1094, 1098 (3d Cir.1989) ("[A]s in *Wexler* and *Cooper*, where the fact finder could not infer that the defendant knew what was behind the locked door of the truck for which he served as 'look out' or in which he travelled, so here the fact finder could not infer that [appellant] knew that the car in which he travelled was transporting a large quantity of cocaine.").

Similarly, in *Idowu*, we reversed the conviction because knowledge of "the specific unlawful purpose charged in the indictment" had not been established. *Idowu*, 157 F.3d at 268 (quoting Wexler, 838 F.2d at 91). There was a great deal of evidence connecting Idowu with the unlawful activity.

*Zavala*, 190 Fed. Appx. at 134 (Internal quotations omitted).

In *Idowu*, the Court held that despite a great deal of evidence connecting *Idowu* with unlawful activity, that the evidence still did not support the "critical inference", that is, the defendant's knowledge of the specific objective of the transaction.   *See United States v. Idowu*, 157 F.3d 265, 268 (3rd Cir. 1998). Emphasizing its earlier holding in *Thomas*, the court in *Zavala* went on to state:

Finally, in *United States v. Thomas*, 114 F.3d 403 (3d Cir.1997), we vacated a drug conviction where the defendant was surveilled entering a room in which a suitcase containing drugs was being kept. The police arrested him as he exited the room. He told the officers that he knew nothing about the suitcase's contents, but was simply paid to make certain that it was in the hotel. On his arrest, however, he had a cellular phone, a pager, and a nine millimeter firearm. The pager had phone numbers connecting him to a target of the drug investigation. As we explained in *Cartwright*, "[w]e concluded from this evidence that Thomas must have known that he was somehow involved in an illicit activity; however, we held that any conclusion that Thomas knew drugs were involved was speculative." *Cartwright*, 359 F.3d at 288.

Notably in this case, the kingpin of the conspiracy, James Springette, did not even mention Dorian Swan's name in his testimony.   Likewise, Mr. Swan's name appeared nowhere on Turnbull's chart.   And although not introduced as substantive evidence at trial, the chart was used to demonstrate the workings of the

organization.   Turnbull never saw Swan pick up drugs and never saw Mr. Swan in possession of cocaine.   However, he did testify that Mr. Swan had tried to attract his business as a purchaser, away from the business of alleged co-conspirator Gelean Mark.   Turnbull conceded that they "used Swan's route when [their] route got too hot."   A logical inference, as testified to by Turnbull, would have been that Swan had his own unique route.   This testimony would have rendered the allegations against Swan inconsistent with the charged conspiracy. The charged route, when hot, would have naturally led the true conspirators to use an *alternate* route, not the one which is the subject of this appeal.

Next, knowledge that Swan was paging someone to deliver or pick up drugs could not be inferred by the mere fact that he paged Turnbull at Kirwin's behest. An inference of guilty knowledge contradicts the mandates of sound precedent. *See Idowu*,   ("despite all of that, we determined that only two inferences were proper: that Idowu had some kind of pre-existing relationship with [a co-conspirator] and that Idowu knew that he was participating in some sort of illegal transaction.").   Here as in *Idowu*, the only reasonable inference would have been that Mr. Swan and Kirwin had some sort of prior relationship.   To have imputed more than that to Mr. Swan was speculative, and contrary to the wisdom taken from the *Idowu* case.

Kevon Isaac's testimony was not based on firsthand knowledge of the

charged conspiracy.   It related back to purported dealings in Mr. Swan's old apartment back in the 1990s.   No rational factfinder could have reasonably inferred the necessary elements from the above testimony. *See United States v. Hopkins*, 518 F.2d 152 (3rd Cir.)(Reversing conspiracy conviction on grounds that hearsay testimony of alleged co-conspirator linking defendant to conspiracy was insufficient evidence).

Kevon Isaac's testimony was the most damaging, as it purported to link Mr. Swan to the bulk of the drugs he was ultimately convicted of. Kevon Isaac's testimony was also the most far removed in time and perception, and hence the easiest to deem unrelated to the case. At best, it could have been reasonably inferred from Isaac's testimony that Mr. Swan was connected to a Baltimore based operation in the 1990's, but that at the times relevant to the subject conspiracy he was attempting to acquire business for his own route.   However it had the effect of punishing Mr. Swan for possession of approximately forty kilos of cocaine from another time and perhaps another hypothetical case in the distant past. In its charge to the jury, the Court instructed, that it would be sufficient if the evidence "establishes beyond a reasonable doubt that the offense was committed on dates reasonably near the dates alleged." [A2279].   The inference drawn by the Government of his temporally misaligned evidence was improper and prejudicial to Mr. Swan.

What the evidence demonstrates in this case is the existence of a separate conspiracy in which Mr. Swan was a member as opposed to his being a member of the conspiracy alleged in the Indictment.   As set forth in the factual basis above, Mr. Swan operated a completely separate route out of St. Croix which ended in New York as opposed to the St. Thomas to North Carolina route run by the group charged in the Indictment.   Swan solicited Turnbull to buy cocaine from him, acting as a competitor to Mr. Gelean Mark who was in charge of operations in St. Thomas.   There was no evidence showing that the cocaine sold by Swan in this matter came from Springette, from Tortola and then through St. Thomas.   Swan's source of supply remains unknown and unnamed because it was in fact a separate conspiracy from that charged in the Indictment and what was known or controlled by the others charged in it.

The testimony of Mr. Swaney further established the existence of a separate and distinct operation from that headed by the Springette/Turnbull/Mark group. Mr. Swaney testified that he was getting cocaine from a connection in Texas when his partner informed him of Mr. Swan's operation being headquartered in New York.   All of his pickups of cocaine occurred in New York, not in the North Carolina area where Turnbull and Isaac operated.   The relatively small amounts of cocaine that Glenson Isaac attributed to Mr. Swan indicates nothing more than a buyer-seller relationship brought about through expediency.

What the evidence demonstrated in this case was a classic "wheel" conspiracy which was, unfortunately for the Government, "rimless". The Supreme Court's decision in *Kotteakos v. United States,* 328 U.S. 750, 66 S. Ct. 1239, 90 L.Ed. 1557 (1946) is controlling here. There the Supreme Court found several conspiracies existed because the defendants could be clustered into separate, independent groups. *Kotteakos,* 328 U.S. at 758. The Court stated that the "dangers for transference of guilt from one to another across the line separating conspiracies, subconsciously or otherwise, are so great that no one really can say prejudice to substantial right has not taken place." *Id.* at 774. Such danger infected this case as it applies to Mr. Swan. While he may have been engaged in illegal drug dealing, he was doing so on his own, well outside the parameters of the conspiracy alleged in the Indictment. The conspiracies therefore were distinct, not parts of a larger general scheme . . . . *Blumenthal v. United States,* 332 U.S. 539, 558, 68 S. Ct. 248, 92 L. Ed.154 (1947).

The Third Circuit employs a three-step inquiry for determining whether there are multiple conspiracies charged in a single count:

> First, we examine whether there was a common goal among the conspirators. Second, we look at the nature of the scheme to determine whether the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators. Third, we examine the extent to which the participants overlap in the various dealings.

*United States v. Kelly,* 892 F.2d 255, 259 (3d Cir. 1989); *U. S. v. Kemp*, 500 F.3d

257 (3d Cir. 2007).

The evidence in this case created a variance between what was alleged in the Indictment and what was proven at trial.   "(A) conviction must be vacated where a variance between the indictment and proof at trial exists to the prejudice of a defendant's substantial rights."   *United States v. Salmon*, 944 F.2d 1106, 1116 (3d Cir. 1991).   "The variance doctrine is designed to protect a defendant's right 'not to be tried *en masse* for the conglomeration of distinct and separate offenses committed by others.'" *Id*.   What was feared in *Kotteakos* and repeated in *Salmon* is what exactly occurred in this instance.   Not only did it occur in the Government's presentation of evidence, this error was highlighted in the Government's rebuttal argument when it highlighted a conversation that occurred between Mr. Swan and Mr. Kevon Isaac six months after an event allegedly occurred with the tape recorded conversation where Mr. Swan refers to "some day ago I had a couple of little fowl thing" set forth in Government Exhibit 44.

Taken as a whole, the evidence regarding Mr. Swan distracted and confused the jury and clearly established that Mr. Swan was involved in a separate conspiracy from the one alleged in the Indictment. Evidence of the essential link between Swan and the Conspiracy was never presented at trial.


## II.    ADMISSION OF EVIDENCE AGAINST MR. SWAN RAN AFOUL OF FED. R. EVID. §404(b).

The evidence presented against Mr. Swan was unrelated to the charged conspiracy, constituted evidence of other crimes, and falls within no cognizable exception. In addition, its prejudicial effect was not outweighed by its probative value.

Federal Rule of Evidence 404(b) acts as a limit on otherwise relevant evidence. *Becker v. ARCO Chemical Co.*, 207 F.3d 176, 189 (3rd Cir. 2000). This Court has adopted a four-part analysis for determining admissibility of 404(b) evidence. As articulated in *Becker*,

> (1) "the evidence must have a proper purpose under Rule 404(b); (2) it must be relevant under Rule 402; (3) its probative value must outweigh its prejudicial effect under Rule 403; and (4) the [district] court must charge the jury to consider the evidence only for the limited purpose for which it was admitted."

*Id.* at 189.

These requirements were not met, particularly the 403 balancing threshold. Because serious deficiencies in the quantum and relevance of proof exist in this case, this Court ought to now consider the overwhelming prejudicial effect of the testimony relating to Mr. Swan. Due process should tolerate no substitute for legitimate proof of guilt.

Because no link was established, the only way to explain the guilty verdict is that the jury relied upon evidence of other bad acts offered by Turnbull, the Isaac brothers and Swaney. This resulted in overwhelming prejudice to Mr. Swan.

Moreover, no cautionary or limiting instruction was read to the jury to protect Mr. Swan from the evidence's prejudicial effect. Such an instruction would have required the jury to infer his guilt only if the elements of the alleged conspiracy were proven and linked to him through circumstantial or direct evidence. No link was established. Hence, reversal is warranted.

### III. THE INTERESTS OF JUSTICE REQUIRE THAT A NEW TRIAL BE ORDERED, BECAUSE THE GOVERNMENT PREJUDICIALLY MISCHARACTERIZED EVIDENCE DURING CLOSING.

The Government's comments during closing argument were improper and resulted in prejudice to Mr. Swan.

At the end of trial, a misleading statement is particularly prejudicial, and may result in a due process violation. *See Berger v. United States*, 295 U.S. 78 (1935). "[I]mproper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Id.* at 88.

In closing, the government commented on a recorded telephone conversation between Mr. Swan and Kevon Isaac in an effort to link the alleged two kilos to the ones testified to by Isaac. In that conversation Swan told Isaac "Ah, some day ago I had couple little fowl and thing um, 'Thrush' end up with two of them. So I had to drive up there and get the cab from he and dem f***, you know what I mean?"

[Gov. Ex. (GX)44]. This characterization is not only misleading, but also inconsistent with the government's own admission that Mr. Isaac's testimony limited Mr. Swan's involvement to May or June 2003. [A2300]. Yet the phone conversation refers to "someday [sic] ago."

The government characterized this evidence as proof of the June 2003 transaction described by Glenson Isaac to tie Swan into the Glenson-Mark conspiracy. Counsel for Mr. Swan made a contemporaneous objection. [A2295].

In its charge to the jury, the Court instructed, that it would be sufficient if the evidence "establishes beyond a reasonable doubt that the offense was committed on dates reasonably near the dates alleged." [A2279]. The telephone conversation took place in December 2003. The transaction the government sought to tie it to took place in May or June of 2003. Eight months difference is not a reasonable time. Hence, the curative instruction offered by the court was futile.


## CONCLUSION

Based on the arguments submitted in this brief, the Appellant, Dorian Swan, Respectfully requests this honorable court to vacate his conviction and sentence, or in the alternative remand for a new trial.

## **<u>CERTIFICATE OF COMPLIANCE - FRAP RULE 32</u>**

I certify that this brief complies with the type-volume limitation set forth in

FRAP 32(a)(7)(B).    This brief contains 5,810 words.

/s/John R. Howes
John R. Howes, Esquire

## <u>CERTIFICATE OF COMPLIANCE RE: E-BRIEF</u>

I hereby certify that the text of the E-Brief and the text of the hard copy are identical.   I also certify that I have performed a virus scan on the E-Brief using Mackeeper 2.11.4.

/s/John R. Howes, Esq.
John R. Howes, Esq.

## **CERTIFICATION OF BAR MEMBERSHIP**

It is certified that Appellant's counsel, John R. Howes, Esq. is a member in good standing of the bar of this Honorable Court and has been since February 26, 1987.


/s/John R. Howes, Esq.
John R. Howes, Esq.

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on October 11, 2016, I caused the foregoing Brief to be electronically filed with the Clerk of the United States Court of Appeals for the Third Circuit through the Court's CM/ECF system, and to have paper copies delivered by sending seven copies of the Brief via FedEx.

I hereby certify that on October 11, 2016, I caused the foregoing Brief to be served upon the following counsel of record for Appellees through the Notice of Docketing Activity issued by this Court's CM/ECF system: Delia Smith, Esquire, United States Attorney's Office, Federal Building and Courthouse 5500 Veterans Drive, Suite 260, U.S. Virgin Islands, 00802-6424 and to the Clerk of the District Court at Federal Building and Courthouse 5500 Veterans Drive, Suite 260, U.S. Virgin Islands, 00802-6424.

*John R. Howes, Esq.*

John R. Howes, Esq.

Dated:   October 11, 2016.