## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

---

### APPEAL NO. 10-4188
_____

### UNITED STATES OF AMERICA,

**Appellee,**

**vs.**

### DORIAN SWAN,

**Appellant.**
_____

## ON APPEAL FROM THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

---

### BRIEF FOR THE UNITED STATES
_____

**RONALD W. SHARPE**
**UNITED STATES ATTORNEY**

**TASHEIKA HINSON**
**Assistant United States Attorney**
**5500 Veterans Drive, Suite 260**
**St. Thomas, Virgin Islands 00802-6424**
**Tasheika.Hinson@usdoj.gov**
**(340) 774-5757**

**COUNSEL FOR APPELLEE**

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ..........................................................................1

    I.    Subject Matter Jurisdiction..................................................1

    II.   Appellate Jurisdiction..........................................................1

STATEMENT OF ISSUES ...................................................................................2

STATEMENT OF THE CASE................................................................................3

    I.    Procedural History...............................................................3

    II.   Statement of Facts ..............................................................4

STATEMENT OF RELATED CASES ..................................................................14

SUMMARY OF ARGUMENT .............................................................................16

ARGUMENT .....................................................................................................17

    I.    THE GOVERNMENT INTRODUCED AMPLE EVIDENCE AT TRIAL TO SURVIVE A CHALLENGE BASED ON THE SUFFICIENCY OF EVIDENCE, INCLUDING THE TESTIMONY OF SEVERAL COCONSPIRATORS WHO DESCRIBED SWAN'S ROLE IN THE CONSPIRACY IN GREAT DETAIL......................17

    II.   THE EVIDENCE OFFERED AT TRIAL WAS INTRINSIC TO THE CHARGED OFFENSE AND NOT SUBJECT TO ANALYSIS UNDER RULE 404(b) ......................................................21

    III.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY ALLOWING THE GOVERNMENT TO CONFRONT SWAN'S ARGUMENT OF A LACK OF EVIDENCE BY POINTING TO SPECIFIC EVIDENCE OF A DRUG TRANSACTION IN THE RECORD...........................................................................26

CONCLUSION ..................................................................................................28

# TABLE OF AUTHORITIES
## Cases

*Burks v. United States*,
    437 U.S. 1 (1978)..........................................................................................18

*Carter v. Hewitt*,
    617 F.2d 961 (3d Cir. 1980) ........................................................................25

*Cavazos v. Smith*,
    -- U.S. --, 132 S. Ct. 2 (2011) .....................................................................18

*Jackson v. Virginia*,
    443 U.S. 307 (1979).................................................................................17, 18

*United States v. Boon*,
    279 F.3d 163 (3d Cir. 2002) ........................................................................22

*United States v. Bowie*,
    232 F.3d 923 (D.C. Cir. 2000)......................................................................24

*United States v. Brennan*,
    326 F.3d 176, 182 (3d Cir. 2003). ...............................................................26

*United States v. Brodie*,
    403 F.3d 123 (3d Cir. 2005) ........................................................................18

*United States v. Caraballo-Rodriguez*,
    726 F.3d 418 (3d Cir. 2013) ......................................................17, 18, 19, 20

*United States v. Claxton*,
    685 F.3d 300 (3d Cir. 2012) ........................................................................15

*United States v. Cross*,
    308 F.3d 308 (3d Cir. 2002) ..................................................................23, 24

*United States v. Glover*,
    558 F.3d 71 (1st Cir. 2009) .........................................................................27

*United States v. Glasser*,
    315 U.S. 60 (1942)......................................................................................17

*United States v. Graham*,
    639 F. App'x 152 (3d Cir. 2016)(unpublished)............................................19

*United States v. Green*,
    617 F.3d 233 (3d Cir. 2010) .................................................................21, 24

*United States v. Iafelice*,
    978 F.2d 92 (3d Cir. 1992) ...........................................................................19

*United States v. Parnell*,
    652 F. App'x 117 (3d Cir. 2016)(unpublished)............................................19

*United States v. Scarfo*,
    850 F.2d 1015 (3d Cir. 1988) .......................................................................24

*United States v. Starnes*,
    583 F.3d 196 (3d Cir. 2009) .........................................................................21

*United States v. Stevens*,
    223 F.3d 239 (3d Cir. 2000) .........................................................................22

*United States v. Syme*,
    276 F.3d 131 (3d Cir. 2002) .........................................................................22

*United States v. Thompson*,
    639 F. App'x 154 (3d Cir. 2016)(unpublished)............................................19

*United States v. Wexler*,
    838 F.2d 88 (3d Cir. 1999) ...........................................................................20

*Wright v. West*,
    505 U.S. 277 (1992)......................................................................................18

## Statutes and Rules

18 U.S.C. § 3231 .........................................................................................................1

18 U.S.C. § 3582(c)(2)...................................................................................4

21 U.S.C. § 841(a)(1)....................................................................................3

21 U.S.C. § 841(b)(1)(A)(ii)(II)....................................................................3

21 U.S.C. § 955.............................................................................................3

21 U.S.C. § 1291...........................................................................................1

FED. R. CRIM. P. 29.....................................................................................3, 4

FED. R. EVID. 403......................................................................................24, 25

FED. R. EVID. 404(a).....................................................................................22

FED. R. EVID. 404(b).............................................................21, 22, 23, 24, 25

# JURISDICTIONAL STATEMENT

## I. Subject Matter Jurisdiction

Because the defendant was charged in an indictment with violations of federal criminal law, the District Court for the District of the Virgin Islands (Hon. Curtis V. Gomez) had subject matter jurisdiction of this case pursuant to Title 18, United States Code, Section 3231.

## II. Appellate Jurisdiction

Based upon the timely filing of a notice of appeal from the order of judgment in a criminal case entered on October 27, 2010, this Court has jurisdiction over this matter pursuant to Title 28, United States Code, Section 1291.

## STATEMENT OF ISSUES

1.      Did the government adduce sufficient evidence at trial to survive a challenge to the sufficiency of the evidence, where the government offered the testimony of several coconspirators who testified regarding: Swan's role in the conspiracy; the drug trafficking route Swan controlled through the Virgin Islands to the U.S. mainland; multiple drug transactions undertaken by Swan; and the method by which Swan transported drug proceeds back to the Virgin Islands from the U.S. mainland?

2.      Was the testimony of Swan's coconspirators *intrinsic* to the offense and therefore not subject to analysis under Rule 404(b) of the Federal Rules of Evidence?

3.      Did the district court abuse its discretion by allowing the government, in its closing statement on rebuttal, to confront Swan's allegations of a lack of evidence by pointing to specific evidence in the record and the testimony of Swan's coconspirator?

## STATEMENT OF THE CASE

### I. Procedural History

On December 19, 2006, a federal grand jury sitting in the District of the Virgin Islands, Division of St. Thomas and St. John, returned a multi-count indictment charging Dorian Swan and nine codefendants with drug trafficking offenses. Joint Appendix at 11 (hereinafter JA).  The indictment charged Swan in *Count One* with conspiring to possess with the intent to distribute more than five kilograms of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(ii)(II).[1]

On May 24, 2010, Swan and several codefendants proceed to trial. JA 83.  At trial, the Government presented the testimony of multiple witnesses, including the testimony of several of Swan's coconspirators and several women who acted as couriers for the organization.  At the close of the Government's case, Swan moved for judgement of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. JA 2023-25.   The district court denied Swan's Motion. JA 2053. Defendant Swan presented a very brief defensive case, and renewed his Rule 29 Motion at the close of all evidence. JA 2083.  The court denied Swan's renewed

---

[1] Defendant Swan was also charged with possessing cocaine on board an aircraft in Counts Four and Eleven of the indictment, in violation of Title 21, United States Code, Section 955.  On the Government's motion, these counts were dismissed by the district court.  JA 45.

Rule 29 Motion as well. JA 2083.  On May 31, 2010, the jury returned guilty verdicts on all counts as to all defendants. JA 87.  Swan stood convicted of *Count One* of the indictment. JA 87.

After trial, on August 2, 2010, Swan again renewed his Rule 29 Motion.[2] JA 1160. This motion was also denied. Doc. 1369.

Swan was sentenced to serve a 210-month term of imprisonment, a $100 special assessment, and a 5-year term of supervised release. (JA 55; Doc. 1260).  In November, 2014, Swan filed a Motion to Reduce Sentence pursuant to Title 18, United States Code, Section 3582(c)(2) and Amendment 782 to the U.S. Sentencing Guidelines. Docs. 1438, 1439, 1442.  The district court granted Swan's motion and reduced his prison sentence to 168 months.[3] Doc. 1473.

## II. Statement of Facts

This is a case about Dorian Swan's role in a wide ranging drug conspiracy involving the importation of thousands of kilograms of cocaine from South America to the Territory of the Virgin Islands (through the British Virgin Islands) and

---

[2] Defendant Swan's motion also advanced additional theories upon which he should be granted a new trial.  (Doc. 1160).  He has abandoned those arguments on appeal, and they are not addressed here.

[3] Swan is currently incarcerated at FCI Yazoo City in Yazoo City, Mississippi, with a release date of September 9, 2019.  *See* Federal Bureau of Prisons, Inmate Locator, https://www.bop.gov/inmateloc/ (last visited December 11, 2016).

ultimately to the United States mainland. As charged in the indictment, the conspiracy began at an unknown time, but no later than 1999, and continued until October, 2005. JA 11.

At trial, the government presented the testimony of several coconspirators in the drug trafficking scheme. First, the government presented the testimony of James Springette, the admitted leader of the conspiracy and drug trafficking organization. JA 164. By any measure, Springette ran a prosperous business: once on the FBI's most wanted list, he exported some 3,000 kilograms of cocaine from South America to the United States between 1999 and 2002. JA 172, 174, 180-81, 412. For a time, Springette operated out of a Colombian prison where he was serving out a prison term for a drug trafficking conviction. JA 166. Springette's narcotics distribution network was multi-layered: from an airstrip on his 200-acre ranch in Venezuela, Springette's workers flew bales of cocaine to the Virgin Islands – where the carefully packaged drugs were dropped into nearby waters, retrieved by coconspirators, stored in the British Virgin Islands, transported to the U.S. Virgin Islands, and then smuggled onto the U.S. mainland for distribution. JA 175-180, 208, 259, 266, 269. The organization established and maintained trafficking routes to Charlotte, North Carolina; Philadelphia, Pennsylvania; Baltimore, Maryland; and New York. JA 262, 265-66. At a selling price of roughly $20,000 per kilogram, the enterprise was very

lucrative for the organization and Mr. Springette earned millions in proceeds. JA 170, 210.

The drug trafficking organization was managed as "a large company," with various echelons of leaders, managers, and employees. JA 248-49, 303-04. Springette managed the "level on the higher echelon, the higher scale…" JA 248. Whereas the organization's "lieutenants" dealt with people on the "lower level." JA 248. Springette's right-hand man in the organization was his cousin, Elton Turnbull. JA 166. Springette first turned to Turnbull for assistance when Springette was in prison in Colombia to serve as his "eyes and ears overseas" so that the drug trafficking enterprise could continue. JA 166.

Turnbull, under Springette's supervision, was assigned various duties in furtherance of the drug conspricy. JA 174-78, 254, 304. He acted as the "Vice President," and oversaw a level of "management," who in turn oversaw lower-level coconspirators akin to "factory workers." JA 304. Turnbull coordinated the arrival of cocaine in the waters surrounding the Virgin Islands, and further coordinated the shipment of cocaine from the Virgin Islands to the U.S. mainland. JA 174-75, 254.

Gelean Mark, a/k/a Kerwin (hereinafter Kerwin), was in charge of moving Springette's cocaine from the Virgin Islands to the U.S. mainland. JA 259-65, 277-78. Mark had connections at the St. Thomas, Virgin Islands, airport who safely routed luggage containing cocaine, typically packaged in 10 kilogram bundles,

through customs and onto airplanes bound for the U.S. mainland. JA 259-63. Turnbull testified that Mark brought Dorian Swan, a/k/a Warhead, into the conspiracy because Swan had a route for the cocaine through the airport to the Philadelphia/Baltimore area. JA 266.    Once the cocaine arrived in the Philadelphia/Baltimore area, Swan would contact Turnbull to let him know the drugs arrived. JA 267.  In turn, Turnbull would send his couriers pick up the cocaine. JA 267.  Turnbull received cocaine via Swan on three or four separate occasions.  JA 267.  Swan was responsible for a trafficking route through the Virgin Islands to the U.S. mainland. JA 420.

Once the cocaine arrived in the U.S. mainland, Glenson Isaac's (hereinafter Glenson) role in the conspiracy came into play. JA 432.  Glenson served as the "main guy" in North Carolina to receive and sell multiple kilograms of cocaine. JA 432.  In turn, Glenson sent the drug proceeds back to St. Thomas. JA 432.  Glenson and Mark recruited and directed the actions of several women who acted as couriers and transported cocaine and money from the U.S. mainland back to the Virgin Islands. JA 269-72.  Glenson also testified at trial regarding Swan's role in the conspiracy. JA 436.

> Q.    What, if anything, occurred, Mr. Isaac, after you returned from that March … trip to North Carolina?
>
> A.    Gelean Mark called me and told me that – to go to New York to receive some drugs from Dorian Swan.

\*\*\*

Q.   What happened when you arrived there?

A.   I met – I called Dorian Swan.  I met him somewhere in the Bronx. He was in a black BMW. And I retrieved a bag out of the back seat of the passenger side.

Q.   What, if anything, was inside the bag?

A.   A half kilo of cocaine.

\*\*\*

Q.   Calling your attention, sir, to June 2003, what, if any, contact did you have with Mr. Dorian Swan?

A.   I went to New York and picked up, picked up some more drugs from him.

Q.   And why were you making this second trip, sir?

A.   Dorian – not Dorian.  Gelean Mark called me and told me to go to New York to retrieve four kilos of cocaine.

\*\*\*

Q.   What, if anything, did you receive when you arrived?

A.   A bag of cocaine.

Q.   And how much, if you can recall, sir, cocaine was inside that bag?

A.   Well it's supposed to have been four.  When I reached to . . . When I reached back to North Carolina, it was only two.  And I called Gelean Mark and told him that I only got two.  And he said that he would call Dorian Swan and find out what was going on.

JA 436-39.

The government also presented the testimony of Kevon Rolston Isaac (hereinafter Kevin), another cooperating coconspirator (and Glenson Isaac's

brother). JA 1066.   Kevon testified that he assisted Swan with shipments of cocaine and drug proceeds on three to four separate occasions from 1999-2002. JA 1406-1420.  Kevon often visited Swan in his Baltimore home. JA 1392.  During the visits, Kevon helped Swan in receiving and counting multiple kilogram shipments of cocaine and packaged drug proceeds in luggage for return to the Virgin Islands. JA 1406-28.  Drug couriers, all of whom were women, would arrive to Swan's home with luggage packed with multiple kilograms of cocaine.  JA 1406-1428.  Swan received the suitcases in his kitchen and paid the women. JA 1406-1428.  After the women left the home, Swan and Kevon would open the luggage:

> Q.    Now, what, if anything, did you do, physically, after the females left the apartment?
>
> A.    I helped [Swan] open up on the luggage.
>
> Q.    And what, if anything, did you see inside the luggage?
>
> A.    I removed – we removed some towels and pants, and I see couple of kilos in the, in the luggage.
>
> ***
>
> Q.    And how many did you count?
>
> A.    One luggage had 18 kilos, and the other luggage had 21.

JA 1410-11.

Kevon also assisted Swan in packing hundreds of thousands of dollars in cash in suitcases for return back to Kerwin (Gelean Mark) in the Virgin Islands.  JA 1419-24.  Kevon testified that on one occassion he helped Swan package $239,000.00 in

a suitcase for delivery to Kerwin in the Virgin Islands.  JA 1419-24.  Swan then

drove a courier to New York for a flight to the Virgin Islands to deliver the case to

Kerwin.  JA 1419-24.

This was also confirmed by a consensually recorded and monitored call

Kevon made to Swan. JA 1428-40.  During the call, Kevon discussed cocaine

trafficking with Swan in coded language and payment to Kerwin in the Virgin

Islands for drugs. JA 1438.

> Q.     What did you talk about in the conversation, sir?
>
> A.     Well, we talked about that he, Dorian Swan, dropped two fowls, meaning dropping two kilos – to my brother [Glenson Isaac].
>
> ***
>
> Q.     Now, you say that you referred to something as fowl.  What does – what does a fowl mean? What is a fowl?
>
> A.     Well, we use a code – when we talking on the phone, we use a code, about fowl meaning, talking about kilos.
>
> ***
>
> Q.     What, if any, discussion you had of Mr. Kerwin in this conversation?
>
> A.     Well, Mr. Dorian Swan were talking about -- Mr. Swan talking about he don't want give somebody no kilos – talking about kilos that – to another guy.  So he don't want to violate their money.  And then had to pay out of pocket and pay Kerwin the value of the cocaine.

JA 1436, 1438-39.

The government also presented the testimony of Christopher Swaney, who testified regarding his own role in the conspiracy, as well as Swan and Glenson's roles. JA 929-1000.  Swaney testified regarding a 20-kilogram drug transaction he engaged in with Swan in New York, and deals he had with Glenson via the Virgin Islands. JA 949, 944-45.  Swan told Swaney how the cocaine was transported via commercial flights.  JA 945-46.  When Swaney expressed concern, Swan explained the scheme at the airport whereby an airport employee would carry the drugs into the airport and through Customs so that the courier would not have drugs when inspected by customs. JA 945-46.  Swan had developed a method of packaging drug proceeds for return to the Virgin Islands that involved heat sealing the cash and wrapping in towels so that it could not be detected by the x-ray machines used at the airport. JA 946.

Q.    And when was the next time you had contact with Mr. Swan?

A.    the next time I had contact with Mr. Swan was, I received a call while in New York, by my partner, advising me that we had some cocaine in New York, in New York, that come from Mr. Swan. I was given directions to a location in New York.  I could not navigate to that location.  I was told to wait ten minutes.  And Mr. Swan called my phone and guided me to that location.

Q.    What happened when you got to the location?

A.    I met with a young man at a McDonalds near the Holland Tunnel in New York.  When I got there, I handed my phone to this man. This man spoke to Dorian for a minutes.  After he spoke to Dorian, he opened up the trunk of his vehicle.  When he opened up the trunk of his vehicle, I received a bag.  I placed the bag inside my vehicle and left.

\*\*\*

Q.      And what, if anything was contained inside of the duffel bag?

A.      Twenty kilograms of cocaine.

\*\*\*

Q.      Now, Mr. Swaney, what, if anything did Mr. Swan say about his friend that he, that was in control?

A.      He said that him and his friend controlled the route of which the cocaine came to, came to the United States.

Q.      And what, if anything, did Mr. Swan say about the route?

A.      Mr. Swan says that, Mr. Swan say that at the route they have someone at the airport that will switch the bags.  Because I expressed a concern at this time about someone getting on a commercial flight with a bag full of cocaine.  And he says it's not – for me not to worry about it, they have someone at the airport who will switch the bags, so the person that is carrying the cocaine on the plane doesn't go through Customs dirty.  He doesn't go through there with the bag to be checked.  The bag is on the other side of the checkpoint.  When he get to the other side of the checkpoint, when the courier gets to the other side of the checkpoint, the bags are switched.  So there's never an interdiction with Customs.

\*\*\*

Q.      Mr. Swaney, what other discussion did you have with Mr. Swan, other than what you've just told us about the [kilos] that you brought from him?

A.      That – well, I expressed concern, also, about the money being returned to the Virgin Islands.  And Mr. Swan advised me that if the money we –

\*\*\*

A.      That the money being returned to the Virgin Islands for payment for the cocaine should be packaged in heat-sealed, in heat sealing

packaging, shrink-wrap packaging, and if they wrap white towels around it, that the x-ray machines in the airport would not catch it.  And I expressed some concern about a couple of those things.

JA 936-37, 940-43, 945-47.

The testimony of coconspirators Springette, Turnbull, Glenson, Kevon, and Swaney was corroborated by the testimony of five women who served as couriers and transported drugs from the Virgin Islands to the U.S. mainland and proceeds from the U.S. mainland back to the Virgin Islands.  *See* JA 680-743, 744-819, 826-66, 876-92, 892-929.

## STATEMENT OF RELATED CASES

This case has spawned a great deal of post-conviction litigation, involving both this Court and the district court.

 Swan's case was previously before this court, but was remanded to the district court for proceedings related to the government's motion to disqualify Swan's appellate counsel.  An evidentiary proceeding was conducted by the district court and, as a result, new counsel was appointed to represent Swan.[4]  Swan's appeal has not yet been decided on the merits. *See* 10-4188

Two of Swan's codefendants in the superseding indictment, Glenson Isaac and Everette Mills, pleaded guilty to the conspiracy charge. *See* 3:06-CR-00080 (D.V.I.).  Glenson and Mills have not appealed their conviction or sentence.

Three of the codefendants who stood trial with Swan have appealed their convictions. *See United States v. Kerry Woods*, No. 10-4041 (affirmed); *United States v. Vernon Fagan*, No. 10-2458 (dismissed), and 10-4694 (currently pending); *United States v. Ells*, No. 12-3177 (dismissed).  Only codefendant Fagan's petition

---

[4] Defendant Swan filed a notice of appeal in this Court on October 25, 2010.  The Government responded by letter informing this Court that Swan's counsel was laboring under a conflict of interest.  An evidentiary hearing was held at the district court and Defendant Swan was appointed replacement counsel.  This appeal is timely.

for rehearing is currently pending before this Court. *See* No. 10-4694. Codefendant Kelvin Moses did not appeal.

The United States appealed the district court's grant of codefendant Craig Claxton's motion for judgment for acquittal. *See United States v. Claxton*, No. 11-2552. This Court reversed the district court and remanded the case for sentencing. *United States v. Claxton*, 685 F.3d 300 (3d Cir. 2012). Claxton's subsequent appeal of his conviction was denied. *See United States v. Claxton*, No. 12-3933 (affirmed).

Gelean Mark and Henry Freeman, also charged in the superseding indictment, were convicted in a separate trial. *See United States v. Mark*, No. 10-4224, and *United States v.Freeman*, No. 09-2166. Mark's conviction was affirmed in part and vacated and remanded in part. *See* No. 10-4224 (*cert. denied* 14-7654). Freeman's first appeal was denied, and a second appeal is currently pending before this Court. *See* No. 16-1816 (pending).

In 2003, Elton Turnbull, who testified against Swan at the jury trial below, pleaded guilty to conspiring to distribute cocaine. *See* D.C. No. 1:02-CR-340-1 (M.D.N.C.). Also is 2003, James Springette, who testified against Swan at the jury trial below, pleaded guilty to conspiring to import cocaine and crack cocaine. *See* D.C. No. 1:98-CR-49 (S.D. Ga.).

# SUMMARY OF ARGUMENT

I.     The government introduced sufficient evidence at trial to survive a sufficiency of the evidence challenge.  The evidence at trial, including testimony of several of Swan's coconspirators clearly demonstrated that he was a member of the drug trafficking conspiracy and that: he had a cocaine trafficking route from the Virgin Islands to the Philadelphia/Baltimore area; other members of the conspiracy met with Swan (or his representatives) to receive cocaine; Swan regularly received cocaine at his home from couriers; Swan packaged hundreds of thousands of dollars in drug proceeds for return to coconspirators in the Virgin Islands; and Swan facilitated the sale of 20 kilograms of cocaine in New York, among other transactions.

II.     The evidence offered at trial against Swan was *intrinsic* to the charged offense – that is, a drug trafficking conspiracy.  Thus, as intrinsic evidence, it was not subject to the strictures of Rule 404(b), was clearly relevant to the charged offense, and the district court did not clearly err by allowing its admission.

III.     The district court did not abuse its discretion by allowing the government, in its closing statement at rebuttal, to confront Swan's allegations of a lack of evidence by pointing to specific evidence in the record and the testimony of Swan's coconspirator.

**ARGUMENT**

**I. THE GOVERNMENT INTRODUCED AMPLE EVIDENCE AT TRIAL TO SURVIVE A CHALLEGE BASED ON THE SUFFICIENCY OF EVIDENCE, INCLUDING THE TESTIMONY OF SEVERAL COCONSPIRATORS WHO DESCRIBED SWAN'S ROLE IN THE CONSPIRACY IN GREAT DETAIL.**

### Standard of Review

This Court exercises plenary review over a challenge to the sufficiency of the evidence and independently applies the same standard as the district court uses in deciding the motion. *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013)(en banc). This review is "highly deferential" to the district court's ruling. *Id.* The jury's verdict "must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *United States v. Glasser*, 315 U.S. 60, 80, 315 62 S.Ct. 457, 86 L.Ed. 680 (1942). All evidence and inferences must be viewed in favor of the verdict, and if "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," the verdict must be upheld. *Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Expounding on this circumscribed scope of review, the Supreme Court explained:

> In *Jackson*, we emphasized repeatedly the deference owed to the trier of fact and, correspondingly, the sharply limited nature of constitutional sufficiency review. We said that "all of the evidence is to be considered in the light most favorable to the prosecution," that the prosecution need

not affirmatively "rule of every hypothesis except that of guilt," and that a reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolves any such conflicts in favor of the prosecution, and we must defer to that resolution."

*Wright v. West*, 505 U.S. 277, 296 (1992)(*quoting Jackson*, 443 U.S. at 318-19). Thus, a jury's verdict may be reversed "only if *no rational trier of fact* could have agreed with the jury." *Cavazos v. Smith*, -- U.S. --, 132 S. Ct. 2, 4, 181 L.Ed.2d 311 (2011) (emphasis added).

Under this standard, a reviewing court "must be ever vigilant . . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [its] judgment for that of the jury." *Caraballo-Rodriguez*, 726 F.3d at 430 (*quoting United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)). In this respect, "[w]hile evidence proffered at trial may be consistent with multiple possibilities, our role as a reviewing court is to uphold the jury verdict . . . as long as it passes the 'bare rationality' test." *Id*. Similarly, the Supreme Court has mandated that "appellate reversal on grounds of insufficient evidence . . . will be confined to cases where the prosecution's failure is clear." *Burks v. United States*, 437 U.S. 1, 17, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).

In order to prove a conspiracy, the government must show: (1) a shared unity of purpose; (2) an intent to achieve a common illegal goal; and (3) an agreement to work toward that goal. *Caraballo-Rodriguez*, 726 F.3d at 425. The government must

establish each element beyond a reasonable doubt and may do so with direct or circumstantial evidence. *Id.*

This Court also clarified that "although the prosecution must prove the defendant's knowledge of the conspiracy's specific objective, that knowledge need not be proven by direct evidence." *Id.* at 431. This Court further noted that "it is not unusual that the government will not have direct evidence. Knowledge is often proven by circumstances. A case can be built against the defendant grain-by-grain until the scale finally tips." *Id.* at 431 (*quoting United States v. Iafelice*, 978 F.2d 92, 98 (3d Cir. 1992)).

In this Court's subsequent application of the standard, it has upheld drug conspiracy convictions where the jury's verdict "did not fall below the threshold of bare rationality." *Id.* at 432-33 ("looking at the evidence as a whole, not in isolation, there is enough evidence to support the jury's inference of knowledge") (internal citations and quotations omitted); *see*, *e.g.*, *United States v. Parnell*, 652 F. App'x 117 (3d Cir. 2016)(unpublished)(finding sufficient evidence to support the jury's guilty verdict in a drug conspiracy case); *United States v. Graham*, 639 F. App'x 152 (3d Cir. 2016)(unpublished)(same); *United States v. Thompson*, 639 F. App'x 154 (3d Cir. 2016)(unpublished)(same).

## **Discussion**

Despite overwhelming evidence to the contrary, Swan argues on appeal that he was not a member of the charged conspiracy—that he, in effect, was a "free agent" independently operating his own separate drug route and not entangled in the Springette conspiracy.  Br. 16-19.  In support, Swan cites this Court to well over twenty cases purporting to advance his theory—but somehow he overlooks this Court's decision in *United States v. Caraballo-Rodriguez.* Br. 16-19.  He does so to his detriment.

In *Caraballo-Rodriguez*, this Court examined its prior decisions involving challenges to the sufficiency of the evidence in drug conspiracies.  726 F.3d 418.  "In looking back at these cases," including several that Swan uses to support his argument, this Court stated that "our analysis has too often been more akin to ad hoc second-guessing the juries' verdicts than exercising a review function based on sufficiency of the evidence." *Id*. at 431.  "With this in mind," this Court continued, "we specifically disavow the reasoning we previously embraced…." *Id.* at 431-32 (*disavowing United States v. Wexler*, 838 F.2d 88 (3d Cir. 1999)).  This Court continued, "[r]eversing the jury's conclusion simply because another inference is possible –or even equally plausible—is inconsistent with the proper inquiry for review of sufficiency of the evidence challenges, …." *Id*. at 432.

Accordingly, and reviewing the evidence presented at trial in the light most favorable to the government, it is clear that the evidence to meets the "bare rationality test." The evidence at trial demonstrated that: Swan was brought into the conspiracy because he had a cocaine trafficking route from the Virgin Islands to the Philadelphia/Baltimore area; that other members of the conspiracy met with Swan (or Swan's operatives) to receive cocaine; that Swan regularly received cocaine at his own home from couriers; that Swan packaged hundreds of thousands of dollars in drug proceeds for return to coconspirators in the Virgin Islands; and that Swan facilitated the sale of 20 kilograms of cocaine in New York, among other transactions. Such evidence is sufficient to allow *any rational trier of fact* to find the essential elements of a drug conspiracy beyond a reasonable doubt.

Thus, Swan's argument fails because the evidence adduced at trial demonstrated conclusively that Swan was, in fact, a member of the charged conspiracy. Swan may have, as he argues, also been a free agent of sorts, but that does not absolve him of culpability for his participation in the Springette conspiracy.

## II.    THE EVIDENCE OFFERED AT TRIAL WAS INTRINSIC TO THE CHARGED OFFENSE AND IS NOT SUBJECT TO ANALYSIS UNDER RULE 404(b).

### Standard of Review

A district court's evidentiary rulings are reviewed principally for abuse of discretion. *United States v. Green*, 617 F.3d 233, 239 (3d Cir. 2010). "An abuse of

discretion occurs only where the district court's decision is 'arbitrary, fanciful, or clearly unreasonable' – in short where 'no reasonable person would adopt the district court's view.'" *Id*. (*quoting United States v. Starnes*, 583 F.3d 196, 214 (3d Cir. 2009)).  However, because Swan failed to preserve this objection under Rule 404(b) in a pretrial motion or at trial, it is reviewed for plain error. *United States v. Boon*, 279 F.3d 163, 174 n.6 (3d Cir. 2002).  Under the plain error standard, a reviewing court may reverse the district court "only if it finds that (1) an error was committed; (2) the error was plain, that is, 'clear' and obvious'; and (3) the error 'affected the defendant's substantial rights.'" *United States v. Syme*, 276 F.3d 131, 160 n.4 (3d Cir. 2002).  If an error is plain and affects a defendant's substantial rights, a Court of Appeals "has the authority to order the correction, but is not *required* to do so." *Id*. (emphasis supplied).  "This Court should exercise its discretion to order such a correction only if the error 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *Id*. (*quoting United States v. Stevens*, 223 F.3d 239, 242 (3d Cir. 2000).  Further, the burden is on Swan to demonstrate that plain error occurred. *Id*.

### Discussion

Swan contends that *all of the testimonial evidence* presented against him at trial constituted evidence of other crimes, unrelated to the charged conspiracy, in

violation of Rule 404(b) of the Federal Rules of Evidence.[5] Br. 19-21.   Although

Swan does not even argue how Rule 404(b) applies, he claims that the testimony

offered against him had an "overwhelming prejudicial effect." Br. 20.   Swan's

arguments ignore the fact that the evidence presented against him at trial was

*intrinsic* to the charged offense and, therefore, not subject to Rule 404(b). *United*

*States v. Cross*, 308 F.3d 308, 320 (3d Cir. 2002).   Further, Swan has not met his

---

[5] Swan's appeal fails to specifically identify the evidence that he now challenges, except to offer a sweeping charge that "[t]he evidence presented against Mr. Swan was unrelated to the charged conspiracy, . . ." Br. 20.   Swan further contends that "no cautionary or limiting instruction was read to the jury," but this belies the record. At trial, Defendant Swan specifically objected to testimony offered by Swaney and moved to "strike all of Mr. Swaney's testimony for violation of Rule 404(b) and 404(a)."   JA 1017-19.   The district court granted Swan's objection, in part, and ordered that certain parts of Swaney's testimony be stricken from the record and gave the following curative instruction:

> Ladies and gentlemen, you may recall that there was some testimony from the witness, Mr. Swaney, where he testified about a purchase of some items, some narcotics, by Mr. Swan at the – at an event that happened in the States.  That reference, that testimony, was improperly before you.  So you need to disregard that portion of testimony.  And the portion I'm talking about is where Mr. Swaney said he sold two kilograms of controlled substance to Mr. Swan.  Again, it is improperly before you. You are not to consider it in any way.

JA 1045-46, 1050.  Thus, the government surmises that since the district court did *in fact* provide a limiting instruction regarding Swaney's testimony, Swan is now offering a blanket objection to *all testimonial evidence* introduced at trial. Br. 21.

burden to demonstrate that the district court plainly erred or that his substantial rights were affected.

Generally, Rule 404(b) provides that evidence of "other crimes, wrongs, or acts" are inadmissible to prove a person's character, but is admissible for "other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." FED. R. EVID. 404(b); *Green*, 617 F.3d at 244-45. Rule 404(b), however, does not apply where the evidence is not of "other crimes," but is "intrinsic" to the charged offense. *Cross*, 308 F.3d at 320 ("Rule 404(b) 'does not extend to evidence of acts which are 'intrinsic' to the charged offense'")(*quoting* FED. R. EVID. 404(b) advisory committee's note); *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000)("if the evidence is of an act that is part of the charged offense, it is properly considered intrinsic"). Evidence is "intrinsic" where it "directly proves the charged offense" or where it is an uncharged act that "facilitates the commission of the charged crime." *Green*, 617 F.3d 233, 249.

Swan was indicted on a drug conspiracy charge, and the testimony of his coconspirators at trial was entirely intrinsic and relevant to the offense for which he stood trial–that is, Swan's participation in the drug trafficking conspiracy. This evidence was also relevant within the meaning of Rule 403. FED. R. EVID. 403. Relevant evidence is admissible so long as its probative value substantially outweighs the danger, if any, of unfair prejudice. FED. R. EVID. 403; *United States*

*v. Scarfo*, 850 F.2d 1015, 1019 (3d Cir. 1988). Here, the evidence offered against Swan was relevant for several permissible purposes. Turnbull's testimony presented the jury with an overview of Swan's entry into the drug organization. Swan provided the organization with a crucial smuggling route to facilitate the movement of cocaine from the Virgin Islands to the U.S. mainland. JA 266-68. Glenson and Swaney's testimony provided the jury with a full understanding of Swan's ability to move cocaine and ultimately distribute it, all under Mark's direction. JA 432-39. Furthermore, Kevon testimony established that he and Swan also received and distributed cocaine once it arrived to the U.S. mainland via couriers. JA 1406-1420. Kevon testified that he assisted Swan in packaging large amounts of drug proceeds destined for the Virgin Islands. JA 1406-28. The admission of this evidence was entirely proper, and also entirely intrinsic to the offense.

Despite Swan's arguments otherwise, Rule 403 does not protect "against evidence that is merely prejudicial, in the sense of being detrimental to a party's case. Rather, the rule only protects against evidence that is *unfairly* prejudicial." *Carter v. Hewitt*, 617 F.2d 961, 972 (3d Cir. 1980)(emphasis supplied). Evidence is unfairly prejudicial "only if it has an 'undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Id.* (*quoting* FED. R. EVID. 403 advisory committee's note). While the testimonial evidence offered by his coconspirators was certainly detrimental the Swan's case, it was not

*unfairly prejudicial* within the prohibition of Rule 403.  Further, the strictures of Rule 404(b) did not apply as the testimonial evidence related to matters intrinsic to the charged drug conspiracy.  Therefore, Swan has not shown any error was committed or that any such error affected his substantial rights, and his argument fails.

### III.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY ALLOWING THE GOVERNMENT TO CONFRONT SWAN'S ARGUMENT OF A LACK OF EVIDENCE BY POINTING TO SPECIFIC EVIDENCE OF A DRUG TRANSACTION IN THE RECORD.

### Standard of Review

The district court's ruling on a challenge to prosecutorial statements at trial is reviewed for abuse of discretion.  *United States v. Brennan*, 326 F.3d 176, 182 (3d Cir. 2003).

### Discussion

During closing argument, Swan suggested the government's entire case against Swan was contrived, and that Kevon's testimony was "incredible". JA 2179. Swan also suggested to the jury that there wasno evidence to confirm that Glenson had received two kilograms of cocaine from Swan in 2003.  JA 2179.  Counsel asked of the jury: "How are you supposed to confirm that story? It's impossible no pictures, no security cameras, no toll both proceeds, no nothing . . .  there's no other evidence that these people were up in New York at all." JA 2180.  On rebuttal, the government argued that the recorded call between Kevon and Swan was evidence of the drug

transaction. JA 2263, 2296-98.  In that call, Swan tells Kevon that he had "couple little fowl . . . and 'Trushy' end up with two of them." JA 1467.  When asked to explain the conversation, Kevon testified that "Thushy" referred to his brother Glenson and that Swan was discussing providing two kilograms of cocaine to Glenson in coded language. JA 1467-70.

Swan contends that the government improperly "mischaracterized" Kevon's testimony during rebuttal arguments. Br. 23.  According to Swan, these remarks were "not only misleading, but also inconsistent with the government's own admission that Mr. Isaac's testimony limited Mr. Swan's involvement to May or June 2003." Br. 23.

The recorded call was made in December, 2003. JA 1461.  Glenson testified that in June 2003 he was directed by Mark to collect two kilograms of cocaine from Swan. JA 611, 1436. The government was entitled to describe the recorded call as the drug transaction between Swan and Glenson. The challenged remarks permissibly urged the jury to focus on the evidence of Swan's actions. *See*, *e.g.*, *United States v. Glover*, 558 F.3d 71, 78-79 (lst Cir. 2009) ("prosecutor [permissibly] was appealing to the jurors' common sense in asking them to credit the government's explanation instead of the defendant's"). Thus, the government's responses during its rebuttal were fair, invited responses to arguments put forth by Swan. *See United States v. Robinson*, 485 U.S. 25, 31(1988) (emphasizing that

prosecutor's claims must be considered in context and holding that "prosecutor's statement that [defendant] could have explained to the jury his story did not in light of the comments by defense counsel infringe [defendant's] Fifth Amendment rights").

Accordingly, the district court did not abuse its discretion by permitting the government's argument at closing and Swan's argument fails.

## <u>CONCLUSION</u>

For the reasons stated above, the government respectfully requests that the judgment of the district court be affirmed.

Respectfully submitted,

RONALD W. SHARPE
United States Attorney

*/s/ Tasheika Hinson*
TASHEIKA HINSON
5500 Veterans Drive, Suite 260
St. Thomas, Virgin Islands 00802-6424
Tasheika.Hinson@usdoj.gov

## CERTIFICATE OF COMPLIANCE

I hereby certify that I am an Assistant United States Attorney for the District of the Virgin Islands, that I am filing the attached Brief for the United States, and:

1.    This brief complies with the length limitations of Fed. R. App. P. 32(a)(7) because:

> [X]    this brief does not exceed 30 pages in length,
> [  ]    this brief contains {} words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), and thus does not exceed [the 13,000-word limit] OR [the {  }word limit requested/granted in this case], or
> [  ]    this brief uses a monospaced typeface and contains {  } lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), and thus does not exceed the 1,300-line limit.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared using Microsoft Word 2016 word-processing system and:

> [X]    it is in a proportionally-spaced typeface, namely Times New Roman, that is at least 14 point, or
> [  ]    it is in a monospaced typeface, namely Courier New 12, having no more than 10 ½ characters per inch.

3.    The text of the electronic PDF brief is identical to the text of the paper copies of the brief.  The electronic PDF brief has been automatically scanned upon e-mail transmission by a virus detection program, namely a continuously-updated version of McAfee EndPoint Security, Version Number 10.1, and no virus was detected.

Dated: December 19, 2016          By:    */s/ Tasheika Hinson*
                                          Tasheika Hinson
                                          Assistant United States Attorney

# CERTIFICATE OF SERVICE

I hereby certify that this brief has been served on the Filing User identified

below through the Electronic Case Filing (ECF) system:

> John R. Howes, Esq.
> John R. Howes, P.A.
> 633 S. Andrews Avenue, Suite 500
> Fort Lauderdale, FL 33301

*/s Tasheika Hinson*
Tasheika Hinson
Assistant United States Attorney

DATED:  December 19, 2016